**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| TANYA CANTERBURY,<br><br>                    Plaintiff,<br><br>          v.<br><br>CAROLYN W. COLVIN, Acting<br>Commissioner of Social<br>Security,<br><br>                    Defendant. | ) Case No. EDCV 15-1974-JPR<br>)<br>)<br>) **MEMORANDUM DECISION AND ORDER**<br>) **AFFIRMING COMMISSIONER**<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**I.   PROCEEDINGS**

Plaintiff seeks review of the Commissioner's final decision denying her applications for Social Security disability insurance benefits ("DIB") and supplemental security income benefits ("SSI").  The parties consented to the jurisdiction of the undersigned U.S. Magistrate Judge under 28 U.S.C. § 636(c).  The matter is before the Court on the parties' Joint Stipulation, filed July 15, 2016, which the Court has taken under submission without oral argument.  For the reasons stated below, the Commissioner's decision is affirmed.

## II.   BACKGROUND

Plaintiff was born in 1971.  (Administrative Record ("AR") 163.)  She completed either the ninth (AR 408, 423) or 10th grade (AR 192, 240) and worked in a cafeteria and a deli (AR 192).

On March 21, 2012, Plaintiff filed for DIB and SSI, alleging that she had been unable to work since March 1, 2012 (AR 240), because of knee and general bone and body pain, a traumatic brain injury, memory loss, depression, internal abdominal bleeding, nerve damage in her legs, "arms pull[ing] out of socket all the time," a lack of stability and balance, a speech impairment, headaches, and numbness in her hands and arms (AR 191).  After her applications were denied initially and on reconsideration, she requested a hearing before an Administrative Law Judge.  (AR 83-84, 109-110, 128.)  A hearing was held on February 21, 2014, at which Plaintiff, who was represented by counsel, testified, as did a vocational expert.  (AR 31.)  In a written decision issued April 18, 2014, the ALJ found Plaintiff not disabled.  (AR 13.)  On April 27, 2014, Plaintiff requested review by the Appeals Council, which denied the request on July 30, 2015.  (AR 1-3, 12.)  This action followed.

## III. STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits.  The ALJ's findings and decision should be upheld if they are free of legal error and supported by substantial evidence based on the record as a whole.  See id.; Richardson v. Perales, 402 U.S. 389, 401 (1971); Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007).  Substantial evidence means such evidence as a reasonable person might accept

as adequate to support a conclusion.  Richardson, 402 U.S. at
401; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007).
It is more than a scintilla but less than a preponderance.
Lingenfelter, 504 F.3d at 1035 (citing Robbins v. Soc. Sec.
Admin., 466 F.3d 880, 882 (9th Cir. 2006)).  To determine whether
substantial evidence supports a finding, the reviewing court
"must review the administrative record as a whole, weighing both
the evidence that supports and the evidence that detracts from
the Commissioner's conclusion."  Reddick v. Chater, 157 F.3d 715,
720 (9th Cir. 1998).  "If the evidence can reasonably support
either affirming or reversing," the reviewing court "may not
substitute its judgment" for the Commissioner's.  Id. at 720-21.

**IV.  THE EVALUATION OF DISABILITY**

People are "disabled" for purposes of receiving Social
Security benefits if they are unable to engage in any substantial
gainful activity owing to a physical or mental impairment that is
expected to result in death or has lasted, or is expected to
last, for a continuous period of at least 12 months.  42 U.S.C.
§ 423(d)(1)(A); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir.
1992).

A.   The Five-Step Evaluation Process

The ALJ follows a five-step sequential evaluation process to
assess whether a claimant is disabled.  20 C.F.R.
§§ 404.1520(a)(4), 416.920(a)(4); Lester v. Chater, 81 F.3d 821,
828 n.5 (9th Cir. 1995) (as amended Apr. 9, 1996).  In the first
step, the Commissioner must determine whether the claimant is
currently engaged in substantial gainful activity; if so, the
claimant is not disabled and the claim must be denied.

3

§§ 404.1520(a)(4)(i), 416.920(a)(4)(i).

If the claimant is not engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting her ability to do basic work activities; if not, the claimant is not disabled and the claim must be denied. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).

If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R. part 404, subpart P, appendix 1; if so, disability is conclusively presumed. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).

If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient RFC to perform her past work; if so, she is not disabled and the claim must be denied. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). The claimant has the burden of proving she is unable to perform past relevant work. Drouin, 966 F.2d at 1257. If the claimant meets that burden, a prima facie case of disability is established. Id. If that happens or if the claimant has no past relevant work, the Commissioner then bears the burden of establishing that the claimant is not disabled because she can perform other substantial gainful work available in the national economy. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v); Drouin, 966 F.2d at 1257. That determination comprises the fifth

4

and final step in the sequential analysis.   §§ 404.1520(a)(4)(v),
416.920(a)(4)(v); Lester, 81 F.3d at 828 n.5; Drouin, 966 F.2d at
1257.

B.   The ALJ's Application of the Five-Step Process

At step one, the ALJ found that Plaintiff had not engaged in
substantial gainful activity since March 1, 2012, the alleged
onset date.   (AR 18.)   At step two, he concluded that she had
severe impairments of "bilateral knee osteoarthritis, status post
left total knee replacement; history of traumatic brain injury;
major depressive disorder; generalized anxiety disorder; and
personality disorder."   (Id.)   At step three, he determined that
her impairments did not meet or equal a listing.   (AR 18-19.)

At step four, the ALJ found that Plaintiff had the RFC[1] to
perform work at the light level of exertion, except that

> she can stand and walk 4 hours during an 8-hour day[;] .
> . . occasionally climb ramps and stairs, but never climb
> ladders, ropes, and scaffolds[; and] . . . occasionally
> balance, stoop, kneel, crouch, and crawl.   She is unable
> to use the left lower extremity for operation of foot
> controls.   She can occasionally push pull with the lower
> extremities.   She should avoid working around unprotected
> heights.   She can understand, remember, and carry out
> simple job instructions, but would be unable to perform
> work that would require directing others, abstract

---

[1] The residual function capacity, or RFC, is what a claimant
can do despite existing exertional and nonexertional limitations.
§§ 404.1545, 416.945; see Cooper v. Sullivan, 880 F.2d 1152, 1155
n.5 (9th Cir. 1989).

5

1   thought, or planning.  She can maintain attention and

2   concentration to perform simple, routine and repetitive

3   tasks in a work environment free of fast-paced production

4   requirements[;] . . . have frequent interaction with

5   coworkers, supervisors, and the general public[;] . . .

6   [and] work in an environment with occasional changes to

7   the work setting and occasional work-relate[d decision-

8   making].

9   (AR 19-20; <u>see</u> AR 57.)  The ALJ concluded that Plaintiff could

10  not perform her past relevant work as a cafeteria or deli worker.

11  (AR 24.) Based on the VE's testimony, he found that Plaintiff

12  could perform jobs existing in significant numbers in the

13  national economy.  (AR 24-25.)  Accordingly, he found her not

14  disabled.  (AR 25.)

15  **V.   DISCUSSION**

16      Plaintiff alleges that the ALJ erred by giving only limited

17  weight to the opinion of treating doctor Elizabeth Hudler,[2] a

18  psychiatrist, and by failing to articulate legally sufficient

19  reasons for finding Plaintiff not credible.  (J. Stip. at 4,

20  15.)[3]

21      A.   <u>The ALJ Properly Assessed Plaintiff's Credibility</u>

22      Plaintiff argues that the ALJ failed to provide clear and

23  convincing reasons for finding her not credible.  (J. Stip. at

24  _____

25      [2] Although Plaintiff frames the issue as "[w]hether the ALJ
    properly assessed probative medical source opinions" (J. Stip. at
26  4), the only assessment she takes issue with is that of Dr.
    Hudler (<u>see</u> <u>id.</u> at 8-10).

27

28      [3] The Court addresses the issues in an order different from
    that followed by the parties.

15.)  For the reasons discussed below, the ALJ did not err.

### 1.   Applicable law

An ALJ's assessment of symptom severity and claimant credibility is entitled to "great weight."  See Weetman v. Sullivan, 877 F.2d 20, 22 (9th Cir. 1989); Nyman v. Heckler, 779 F.2d 528, 531 (9th Cir. 1986).  "[T]he ALJ is not required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to" the law.  Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012) (citing Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989)).

In evaluating a claimant's subjective symptom testimony, the ALJ engages in a two-step analysis.  See Lingenfelter, 504 F.3d at 1035-36.  "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment [that] could reasonably be expected to produce the pain or other symptoms alleged."  Id. at 1036.  If such objective medical evidence exists, the ALJ may not reject a claimant's testimony "simply because there is no showing that the impairment can reasonably produce the degree of symptom alleged."  Smolen v. Chater, 80 F.3d 1273, 1282 (9th Cir. 1996) (emphasis in original).

If the claimant meets the first test, the ALJ may discredit the claimant's subjective symptom testimony only if he makes specific findings that support the conclusion.  See Berry v. Astrue, 622 F.3d 1228, 1234 (9th Cir. 2010).  Absent a finding or affirmative evidence of malingering, the ALJ must provide "clear and convincing" reasons for rejecting the claimant's testimony.

Brown-Hunter v. Colvin, 806 F.3d 487, 493 (9th Cir. 2015) (as amended); Treichler v. Comm'r of Soc. Sec. Admin., 775 F.3d 1090, 1102 (9th Cir. 2014).   The ALJ may consider, among other factors, (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; (3) the claimant's daily activities; (4) the claimant's work record; and (5) testimony from physicians and third parties.   Rounds v. Comm'r Soc. Sec. Admin., 807 F.3d 996, 1006 (9th Cir. 2015) (as amended); Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002).   If the ALJ's credibility finding is supported by substantial evidence in the record, the reviewing court "may not engage in second-guessing."   Thomas, 278 F.3d at 959.

### 2.   Relevant background

In a disability report dated April 19, 2012, Plaintiff stated that she stopped working on April 1, 2008, "[b]ecause of [her] conditions," which she listed as

> (1) Pain in [sic] all over body and bad memory; (2)
> Subderal [sic] hematoma brain surgery, no memory; (3)
> Internal bleeding in abdominal area; (4) Lots of knee
> pains, can't walk long periods of time; (5) Nerve damage
> in legs; (6) Arms pull out of socket all the time; (7) No
> stability, no balance; (8) Depression; (9) Speech
> impairment; (10) Constantly bones hurt daily; (11) Lots
> of headaches, numbness [in] hands and arms.

(AR 191.)   In a report dated May 6, 2012, completed by her

8

1    attorney, Plaintiff claimed that she stopped working on January
2    1, 2010.  (AR 199-200.)

3        In a function report dated February 21, 2013, Plaintiff
4    complained about her poor memory, knee pain, and "bleeding in the
5    brain."  (AR 222, 230.)  She noted that she lived with her uncle.
6    (AR 222.)  She took care of his dog, prepared her own food, did
7    her own laundry, and washed the dishes.  (AR 223-24.)  She noted
8    that pain and worry made it hard for her to fall asleep.  (AR
9    223.)  She needed reminders to take her medication.  (AR 224.)
10   She went outside daily and shopped "once a week or two" for about
11   one or two hours.  (AR 225.)  She stated that her hobbies, when
12   her "life was normal," included gardening and cooking, but that
13   she had not been able to do those activities since her life had
14   changed.  (AR 226.)  She visited the library every day and church
15   once a week.  (Id.)

16       She noted that she could not exercise or run and could
17   barely walk.  (AR 227.)  Her conditions allegedly affected her
18   ability to lift, squat, bend, reach, walk, kneel, talk, and climb
19   stairs.  (Id.)  She reported that when she tried to lift
20   something her "arm bones go out of joint."  (Id.)  Her memory,
21   concentration, understanding, ability to follow instructions, and
22   ability to get along with others were also affected.  (Id.)  She
23   reported that she could walk only 100 yards before having to rest
24   for five minutes and could pay attention for only about a minute.
25   (Id.)  She reported that she couldn't follow instructions well
26   and that spoken instructions needed to be repeated slowly before
27   she could follow them.  (Id.)  She noted that she used a cane and
28   a brace or splint every day.  (AR 228.)  She ticked the box

9

1  indicating that she took medications for her conditions and noted
2  that they did not cause side effects.  (AR 229.)

3       In a third-party function report also dated February 21,
4  2013, Plaintiff's friend Peter Almryde stated that he spent 60
5  percent of his time with her.  (AR 212.)  He noted that she was
6  currently living with him and his family.  (Id.)  He stated that
7  she couldn't "walk fast or run or go down stairs but one step at
8  a time."  (Id.)  She had a hard time remembering and
9  comprehending things.  (Id.)  He noted that "when her arm
10 pull[ed] out of joint" he had to "pull it forward."  (AR 213.)
11 He stated that she fed and picked up after her uncle's dog.
12 (Id.)  He noted that "sometimes [her] pain [is] so bad, she can't
13 sleep."  (Id.)  She prepared her own meals daily and did her own
14 laundry but needed reminders to take her medication.  (AR 214.)
15 She did not do housework because it was not her house, but she
16 cleaned up after herself.  (AR 215.)  He noted that she went
17 outside every day.  (Id.)  She shopped for food and hygiene
18 products once a week, for an "hour or so."  (Id.)  He noted that
19 she liked to garden but hardly did it anymore and that she went
20 out regularly to the library and to visit her daughter.  (AR
21 216.)  For the section on how her conditions affected her
22 abilities, he checked the same boxes Plaintiff had checked but
23 indicated that her "standing" and "completing tasks" were also
24 affected.  (AR 217.)  He also wrote that she didn't walk anymore,
25 noting that she could walk only 100 yards before needing a five-
26 minute rest.  (Id.)  She could pay attention for only about a
27 minute.  (Id.)  He also noted that she used a brace or splint,
28 and possibly an artificial limb (AR 218), and commented that her

legs were "extremely bad" (AR 219).

In a progress report dated May 23, 2013, Plaintiff was noted to be in "early remission" from alcohol dependence.  (AR 526.) She was encouraged to participate in an Alcoholics Anonymous program.  (AR 527.)  She was in a "more stable, less tearful, and less anxious mood" and reported "staying clean and sober" and "attending AA" twice a week.  (AR 526.)  On June 27, 2013, it was noted that she was "spending much of her time looking for work." (AR 524.)  She reported that she was "staying sober," but she had "not gone to AA meetings lately" and denied alcohol cravings. (Id.)  On August 8, 2013, her doctor noted that she "tend[ed] to evade questions about" her alcohol and drug use.  (AR 523.)  On October 7, 2013, she stated that she had been "sober and clean" for eight to nine months but was no longer involved in AA.  (AR 38, 473.)  At a January 29, 2014 health-center visit, she reported that she was not attending AA because of transportation issues, didn't "have time" for her sponsor anymore, and had had a substance-abuse relapse three weeks earlier.  (AR 519.)

At the hearing on February 21, 2014, Plaintiff testified that she was involved in a car accident in 1994.  (AR 39.)  She pointed to that accident as the beginning of her pain and related psychological issues.  (Id.)  She testified that she had a "very bad memory, short-term," and was in "lots of pain all of the time."  (Id.)  She confirmed that she worked at a cafeteria in 2007 and 2008, after the accident.  (AR 62.)  She also worked in a deli and in various grocery stores.  (Id.)

She testified that she "couch surf[ed]" among her uncle, her mother, and a good friend — presumably Almryde, given his

11

1   testimony that he spent 60 percent of his time with her.  (AR
2   35.)  She was responsible for the general upkeep of the place
3   where she stayed.  (<u>Id.</u>)  She cleaned, took care of the friend's
4   grandchildren (ages eight, six, and 10 months), and cooked
5   dinners and breakfasts.  (AR 36.)  She testified that she took
6   the children out of the apartment when she could, to the mailbox
7   or the swimming pool in the apartment complex.  (AR 54.)  She
8   noted that the mother of the baby was often present but that when
9   Plaintiff was asked to watch the kids she was obligated to say
10   yes because she was living under their roof.  (<u>Id.</u>)  She made her
11   friend's bed.  (AR 37.)  When the ALJ asked, "[I]s there anything
12   around the house that you're not able to do?," Plaintiff
13   responded that she couldn't "take out the trash."  (AR 38.)[4]

14        Plaintiff had a left-knee replacement in December 2013.  (AR
15   520.)  She testified that she had been looking for work and had
16   put in 38 job applications before her knee surgery.  (AR 40.)
17   She testified that she got a job, spinning a sign for a pizza
18   restaurant, that lasted about two weeks.  (AR 41, 48.)  She noted
19   that the job "was very hard" and that the shop was now out of
20   business; it was unclear whether that was why she worked for only
21   two weeks.  (AR 48.)  She testified that she stopped looking for
22   work after her surgery because she could not walk anymore.  (AR
23   47.)  She stated that she took gabapentin, Cymbalta, trazodone,

24

25

26   _____

27        [4] When Plaintiff applied for benefits, she acknowledged that
28   she did not need help "in personal care, hygiene or upkeep of a
     home."  (AR 164.)

and hydroxyzine.[5]  (AR 42.)  She noted that the Cymbalta had
"helped a lot for the depression" and that the gabapentin was no
longer helping her anxiety but that she had been taking a new
pill, hydroxyzine, for it for about a month.  (AR 42, 44.)  She
testified that she went to a rehab facility for alcohol addiction
in 2012 for five months (AR 45), last smoked marijuana "a couple
of years" before the hearing (AR 46), and last used
methamphetamine in 2010 or 2011 (id.).

          3.  Analysis

     The ALJ credited some of Plaintiff's subjective complaints,
finding her "partially credible."  (AR 21.)  He noted that her
"statements concerning the intensity, persistence and limiting
effects of [her] symptoms [were] not entirely credible."  (AR
22.)  However, "[i]n order to give full benefit to [her]
subjective complaints," the ALJ "adopted the limitations
described in the residual functioning capacity."  (AR 24.)  Thus,
he found that she could perform "less than a full range of light
work," with limited cumulative hours of standing and walking and
restrictions on climbing and using her left lower extremity for

---

[5] Gabapentin is used to treat neuropathy.  See Gabapentin,
MedlinePlus, https://medlineplus.gov/druginfo/meds/a694007.html
(last updated July 15, 2011).  Cymbalta is the brand name of a
selective serotonin and norepinephrine reuptake inhibitor used to
treat depression and generalized anxiety disorder.  See
Duloxetine, MedlinePlus, https://medlineplus.gov/druginfo/meds/
a604030.html (last updated May 15, 2016).  Trazodone is a
serotonin modulator used to treat depression.  See Trazodone,
MedlinePlus, https://medlineplus.gov/druginfo/meds/a681038.html
(last updated Nov. 15, 2014).  Hydroxyzine is used to relieve
anxiety and tension.  See Hydroxyzine, MedlinePlus, https://
medlineplus.gov/druginfo/meds/a682866.html (last updated May 15,
2016).

operating foot controls. (AR 19-20.) To the extent the ALJ discounted Plaintiff's subjective complaints, he provided clear and convincing reasons for doing so.

The ALJ permissibly found Plaintiff's subjective complaints only partially credible because the objective medical evidence did not support them. He noted that Plaintiff reported pain in her knees (see, e.g., AR 296 (alleging "knee pain"), 520 (alleging pain in left knee)), but her medical records showed that any knee problems had been addressed and apparently resolved. (AR 21-22; see, e.g., AR 294 (May 18, 2012: diagnosed with knee sprain, brace given), 296-97 (June 7, 2012: no erythema, nontender, strength noted at 5/5, diagnosed as knee sprain, medication provided), 302 (July 12, 2012: knee strength 5/5 in left knee, diagnosed as patellar tendinitis, prescribed medication).) The ALJ noted that her December 2, 2013 knee-replacement surgery "went well and was without complications." (AR 22.) Her testimony that she had been unable to walk since her surgery (see, e.g., AR 47) was unsubstantiated by any evidence in the medical record.[6]

The ALJ also noted that she reported various mental impairments (see, e.g., AR 222 ("My memory is the worst"), 342 (reporting anxiety and depression), 352 (same)), but her medical records indicated that medication had alleviated these symptoms (AR 22); indeed, her doctors consistently noted that she responded well to medication (see, e.g., AR 342 (Aug. 2, 2012:

---

[6] Plaintiff has not argued for a closed period of disability based on her knee pain leading up to her surgery.

reported improved mood when taking medications), 389 (Oct. 25, 2012: reported anxiety well controlled and depressed mood gradually improving), 443 (Feb. 28, 2013: "in more stable, less tearful, and less anxious mood"), 520 (Oct. 7, 2013: "calmer and less dramatic than at previous appointments" and "Gabapentin does seem to be helping her anxiety").)  The ALJ was entitled to consider the lack of objective medical evidence in assessing Plaintiff's subjective complaints and credibility.  See Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1161 (9th Cir. 2008) ("Contradiction with the medical record is a sufficient basis for rejecting the claimant's subjective testimony."); Lingenfelter, 504 F.3d at 1040 (in determining credibility, ALJ may consider "whether the alleged symptoms are consistent with the medical evidence"); Burch v. Barnhart, 400 F.3d 676, 681 (9th Cir. 2005) ("Although lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ can consider in his credibility analysis.").

Further, the ALJ permissibly discounted Plaintiff's subjective complaints because her daily activities were inconsistent with her allegedly disabling impairments.  (AR 21.) The ALJ read and considered Plaintiff's adult function report, in which she claimed that her conditions affected her ability to lift, squat, bend, reach, walk, kneel, talk, climb stairs, remember, concentrate, understand, follow instructions, and get along with others.  (AR 21, 227.)  He took note that her alleged functional limitations were at odds with her reported daily activities.  (AR 21.)  He noted that she "lives with a friend who she takes care of in return for a place to stay" and "cooked and

cleaned and helped him care for his grandkids." (AR 21.)  She

testified that she was "totally" responsible for keeping the

house clean.  (AR 35.)  When asked whether there was anything

around the house that she was not able to do, she stated only

that she could not "take the trash out any more." (AR 38.)  In

her function report, she noted that she was able to prepare her

own food, go outside daily, shop, and do daily chores.  (AR 224-

25.)  An ALJ may properly discount a plaintiff's credibility when

her daily activities are inconsistent with her subjective symptom

testimony.  See Molina, 674 F.3d at 1112 (ALJ may discredit

claimant's testimony when "claimant engages in daily activities

inconsistent with the alleged symptoms" (citing Lingenfelter, 504

F.3d at 1040); even some difficulties in daily functioning "may

be grounds for discrediting the claimant's testimony to the

extent that they contradict claims of a totally debilitating

impairment"); Bray v. Comm'r of Soc. Sec. Admin., 554 F.3d 1219,

1227 (9th Cir. 2009) (ALJ properly discounted plaintiff's

credibility when she had "recently worked as a personal caregiver

for two years, and has sought out other employment since then");

Foster v. Astrue, No. EDCV 11-1077-OP, 2012 WL 243253, at *10

(C.D. Cal. Jan. 23, 2012) (finding that ALJ properly considered

plaintiff's "ability to perform part-time work" when assessing

credibility).

The ALJ also took note that Plaintiff recently attempted to

find a job.  (AR 22; see also, e.g., AR 524 (looking for job in

June 2013).)  Holding oneself out as available for full-time work

can be inconsistent with allegations of disability.  See Bray,

554 F.3d at 1227 (fact that claimant has sought employment

1   weighed against credibility of claims of disabling limitations);

2   Copeland v. Bowen, 861 F.2d 536, 542 (9th Cir. 1988).

3       The ALJ also noted that although Plaintiff alleged various

4   mental limitations, her treating psychiatrist questioned her

5   effort.  (AR 23.)  Dr. Hudler noted that Plaintiff's "extremely

6   low" mental-exam score was very likely a result not of diminished

7   ability but rather of "not giving her full effort."  (AR 522.)

8   Indeed, Dr. Hudler remarked that Plaintiff's score was

9   "inconsistent with someone who basically lives independently."

10  (Id.)  This was a legally sufficient reason for discounting

11  Plaintiff's credibility.  See Thomas, 278 F.3d at 959 (ALJ

12  properly considered claimant's "self-limiting behaviors" and

13  "efforts to impede accurate testing" during two physical-capacity

14  evaluations); Tonapetyan v. Halter, 242 F.3d 1144, 1148 (9th Cir.

15  2001) (ALJ properly considered claimant's poor effort during

16  consultative examinations).[7]

17      Finally, the ALJ was permitted to rely on Plaintiff's

18

19

20      [7] Plaintiff argues that Dr. Hudler's statements concerning
    Plaintiff's minimal effort should not have been relied on by the
21  ALJ as detracting from Plaintiff's credibility because "Dr.
    Hudler took specific awareness of that finding into account and
22  rendered her opinions with full knowledge" of it, citing as
    support for this proposition Ogin v. Colvin, 608 F. App'x 519
23  (9th Cir. 2015).  (J. Stip. at 23.)  But Ogin stands for the
    opposite of what Plaintiff claims, holding that "lackluster
24  effort would be a legitimate reason to discount [the claimant's]
    credibility."  608 F. App'x at 520.  The error in Ogin was in
25  discounting the doctor's opinion on this basis.  Id.  Dr.
    Hudler's finding that the "extremely low" score was
26  "inconsistent" with Plaintiff's "independent" lifestyle
    demonstrates that she questioned Plaintiff's effort; the ALJ
27  permissibly took this into account in assessing Plaintiff's
    credibility.
28

treatment history in discounting her subjective complaints.  The ALJ stated that "[t]he treatment records reveal [Plaintiff] received routine, conservative and non-emergency treatment since the alleged onset date." (AR 22.)  He noted that her knee surgery "went well and was without complications." (Id.)  Although the need to have surgery "would normally weigh in [her] favor, it is offset by the fact that the record reflects that the surgery was generally successful in relieving the symptoms." (AR 21.)  As to her alleged mental impairments, the ALJ noted that she consistently reported positive responses to medication. (AR 22; see also supra pp. 14-15.)  She did well when she attended AA for her alcohol dependence.[8] (AR 22.)  Plaintiff's successful conservative, nonemergency treatment was a clear and convincing reason for discounting her subjective complaints.  See SSR 96-7p, 1996 WL 374186, at *7 (July 2, 1996) (claimant's statements "may be less credible if the level or frequency of treatment is inconsistent with the level of complaints").

In sum, the ALJ provided clear and convincing reasons for finding Plaintiff only partially credible.  Because those findings were supported by substantial evidence, this Court may not engage in second-guessing.  See Thomas, 278 F.3d at 959.  Plaintiff is not entitled to remand on this ground.

---

[8] Plaintiff reported being "clean and sober" in May 2013 when she was attending AA twice a week.  (AR 526.)  She voluntarily stopped participating in the AA program sometime around June 2013.  (AR 524.)  At a January 29, 2014 health-center visit, she reported that her nonparticipation was because of transportation issues, but she also said she didn't "have time" for her sponsor.  (AR 519.)  She had had a substance-abuse relapse three weeks earlier.  (Id.)

B.   <u>The ALJ Properly Gave Limited Weight to Dr. Hudler's
     Medical-Source Statement</u>

Plaintiff argues that the ALJ failed to properly assess a probative medical-source opinion; specifically, he erred in giving only limited weight to the opinion of Dr. Hudler, one of her treating psychiatrists. (J. Stip. at 4, 8.)  For the reasons discussed below, remand is not warranted on this ground.

1.   <u>Applicable law</u>

Three types of physicians may offer opinions in Social Security cases: (1) those who directly treated the claimant, (2) those who examined but did not treat the claimant, and (3) those who did neither.  <u>Lester</u>, 81 F.3d at 830.  A treating physician's opinion is generally entitled to more weight than an examining physician's, and an examining physician's opinion is generally entitled to more weight than a nonexamining physician's.  <u>Id.</u>

This is so because treating physicians are employed to cure and have a greater opportunity to know and observe the claimant. <u>Smolen</u>, 80 F.3d at 1285.  If a treating physician's opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record, it should be given controlling weight.  §§ 404.1527(c)(2), 416.927(c)(2).  If a treating physician's opinion is not given controlling weight, its weight is determined by length of the treatment relationship, frequency of examination, nature and extent of the treatment relationship, amount of evidence supporting the opinion, consistency with the record as a whole, the doctor's area of specialization, and other factors.  §§ 404.1527(c)(2)-(6),

19

416.927(c)(2)-(6).

When a treating physician's opinion is not contradicted by other evidence in the record, it may be rejected only for "clear and convincing" reasons.  See Carmickle, 533 F.3d at 1164 (citing Lester, 81 F.3d at 830-31).  When it is contradicted, the ALJ must provide only "specific and legitimate reasons" for discounting it.  Id. (citing Lester, 81 F.3d at 830-31).  Furthermore, "[t]he ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings."  Thomas, 278 F.3d at 957; accord Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1195 (9th Cir. 2004).

        2.   Relevant background

                a.   *Clinical findings in the record from doctors besides Hudler*

Between May and September 2012, Plaintiff visited a health center for various complaints.  (See, e.g., AR 294 (May 18, 2012 visit for "cold symptoms"), 296 (June 7, 2012 visit for "knee pain"), 298 (June 21, 2012 visit for a well-woman exam), 300 (July 5, 2012 visit for lab results), 302 (July 12, 2012 visit for knee pain, cough, and sore throat), 304 (Aug. 23, 2012 visit for urinary issue), 306 (Sept. 20, 2012 visit for "cold symptoms" and throat pain).)  At those visits, her "extremities" were consistently assessed as normal: no edema, no erythema, and sensations intact.  (AR 294, 296, 304, 306.)  During the visits specifically related to knee pain, her knee strength was assessed as "5/5" and her knees were noted to be "nontender."  (AR 296, 302.)

On May 16, 2012, while participating in a residential rehabilitation program, Plaintiff was assessed at a health center after "experiencing some withdrawal [symptoms] from [her] medication." (AR 256.)  In the mental-status exam completed during that visit, Plaintiff was noted to be "depressed" with "fair" judgment and insight.  (AR 262.)  She was noted to have "poor recent" memory.  (<u>Id.</u>)  In all other categories (level of consciousness, orientation, appearance, speech, thought process, behavior, affect, intellect, and motor) she was assessed as normal or average.  (<u>Id.</u>)  Another mental-status exam was completed the next day, and Plaintiff was assessed as "sad" and "anxious" in her mood, "relevant" and "depressive" in her thought content, "marginal" in her impulse control, and "limited" in her judgment and insight.  (AR 286-87.)  In all other categories she was assessed as average or normal.  (<u>Id.</u>)

Plaintiff returned to the health center on June 13, 2012, reporting that she was "doing well on medications and [was] not having to use the [t]razodone every night." (AR 277.)  Her memory was "intact" and her insight and judgment were "fair." (<u>Id.</u>)  On June 18, 2012, Plaintiff returned to the health center, "reporting a good response to [her] current regime [sic]." (AR 276.)  She felt her mood was "stable" and her depression was "well controlled." (<u>Id.</u>)  A mental-status examination conducted on June 29, 2012, at the health center found that Plaintiff had "soft" speech, a "depressed" mood, poor recent and remote memory, and "slowed/decreased" motor responses, but her insight and judgment were "fair." (AR 365.)  In a later visit to the health center, on July 26, 2012, Plaintiff was noted to be "doing well

on current regime [sic]." (AR 275.)  Her mood was "stable" and her symptoms were "well controlled." (Id.)  In a mental-status exam on August 2, 2012, Plaintiff was assessed as normal or average in all categories.  (AR 348.)

In a mental-status exam on December 6, 2012, after Plaintiff had left the rehabilitation program, she was assessed as having "limited" judgment and insight but showed "average" intellect, "normal" memory, "normal" motor skills, and a "euthymic"[9] mood. (AR 430.)  In a consult on December 2, 2013, just before her knee-replacement surgery, the doctor noted that Plaintiff had "[n]o new memory loss or depression" and she "[i]nteracts normally with others." (AR 476.)  On January 29, 2014, her insight and judgment were reported as "fair" and her affect was reported as "calm [and] congruent." (AR 519.)

b.   *Opinions of the state-agency medical consultants*

In the Disability Determination Explanation from September 22, 2012, a state-agency medical consultant, psychologist Pamela Hawkins,[10] indicated that Plaintiff had medically determinable and severe muscle, ligament, and fascia disorders; affective disorders; anxiety disorders; and substance-abuse-addiction

---

[9] "Euthymic" means characterized by joyfulness, mental peace, and tranquility; it reflects moderation of mood and means not manic or depressed.  Stedman's Medical Dictionary 627 (27th ed. 2000).

[10] Dr. Hawkins's signature line includes a medical-consultant code of "38," indicating "[p]sychology" (AR 71); see Program Operations Manual System (POMS) DI 24501.004, U.S. Soc. Sec. Admin. (May 5, 2015), http://policy.ssa.gov/poms.nsf/lnx/0424501004.

disorders.  (AR 70.)  Dr. Hawkins noted that a lack of
longitudinal evidence existed in the medical records.  (AR 71.)
She found "insufficient evidence to adjudicate the claim" because
Plaintiff's medical records were not signed.  (Id.)

On August 7, 2012, another state-agency medical consultant,
Dr. E.L. Gilpeer, a specialist in internal medicine,[11] assessed
Plaintiff's RFC.  (AR 71-72.)  Dr. Gilpeer noted that her medical
records showed normal extremities, a full range of motion, no
erythema in the left knee, normal strength of "5/5," and normal
deep-tendon reflexes.  (AR 72.)  Dr. Gilpeer noted an earlier
assessment of left patellar tendinitis and determined that she
had "no exertional (lifting, carrying, walking, standing,
sitting, pushing, or pulling) or non-exertional (postural,
manipulative, visual, communicative, or environmental)
limitations."  (Id.)  Dr. Gilpeer's assessment was based on his
review of the independent clinical findings in the record.  (AR
72; see, e.g., AR 294 (health-center report showing normal
extremities), 302 (health-center report diagnosing patellar
tendinitis but showing normal strength and reflexes).)

On March 5, 2013, in a subsequent review undertaken for
reconsideration of benefits, Dr. L. DeSouza, a general
practitioner,[12] completed a case analysis.  (AR 91.)  Dr. DeSouza
noted that Plaintiff alleged "pain all over body," a "brain

---

[11] Dr. Gilpeer has a specialty code of "19," indicating
"[i]nternal [m]edicine" (AR 83); see POMS DI 24501.004.

[12] Dr. DeSouza has a specialty code of "12," indicating
"[f]amily or [g]eneral [p]ractice" (AR 109); see POMS DI
24501.004.

hemorrhage," and "knee pain" but noted that she could do chores, walk, and shop and that her physical conditions were not severe. (Id.) Dr. DeSouza's assessment was based on the same independent clinical findings as those used by Dr. Gilpeer, but he also reviewed more recent medical evidence. (See, e.g., AR 91 (Dr. DeSouza's findings that Plaintiff's physical symptoms were "non-severe" and referring to "9/20/12" medical record), 306 (Sept. 20, 2012 health-center record showing normal extremities).)

In the same review, Dr. P.M. Balson[13] found that although Plaintiff had severe affective disorder, anxiety disorder, and alcohol- and substance-abuse disorder, she had only mild restrictions in activities of daily living and in maintaining social functioning and moderate difficulties in maintaining concentration, persistence, or pace. (AR 91-92.) Dr. Balson found that Plaintiff had not experienced any episodes of decompensation of extended duration. (AR 92.) Dr. Balson also assessed her RFC, noting that she had limitations in understanding and memory but was not significantly limited in her ability to remember locations and worklike procedures or understand and remember very short and simple instructions. (AR 93.) Dr. Balson found that Plaintiff was moderately limited in her ability to understand, remember, and carry out detailed instructions. (AR 94.) Dr. Balson also found that she was moderately limited in her ability to complete a normal workday

_____

[13] Dr. Balson is apparently a psychiatrist, see Novoa v. Colvin, No. CV 13-00219-MAN, 2014 WL 3854369, at *2 (C.D. Cal. Aug. 6, 2014), although the record in this case does not so indicate.

and workweek without interruptions from psychologically based
symptoms and perform at a consistent pace without an unreasonable
number and length of rest periods.  (Id.)  Dr. Balson noted that
Plaintiff "started [treatment] at the end of 2012 for her
substance abuse and mood disorder," a fact reflected in
independent clinical findings in the record.  (See, e.g., AR 441
(Dec. 6, 2012 health-center report noting Plaintiff's placement
in substance-abuse rehabilitation center).)  Dr. Balson further
opined that Plaintiff had a mood disorder and a "history of
inability to handle significant changes in life such as death in
[the] family" but that she should be able to handle simple,
unskilled work "if she maintains sobriety and remains compliant
with meds."  (AR 94.)  Dr. Balson relied on the independent
clinical findings in the record in coming to this conclusion.
(Id.; see, e.g., AR 417-41 (Dec. 6, 2012 record with "normal" and
"average" mental-status exam findings, discussion of alcohol-
abuse concerns, and notation of Plaintiff's reports of stable
mood on current medications).)

                    c.   *Dr. Hudler*

     Plaintiff met with Dr. Hudler on January 23, 2013, for a
psychiatric assessment.  (AR 403.)  Plaintiff reported
"depression, anxiety, panic attacks, and feelings of
worthlessness."  (Id.)  She met with Dr. Hudler again on February
28, 2013, presenting as "more stable, less tearful, and less
anxious" in her mood.  (AR 443.)  She visited Dr. Hudler at least
three times after the above state-agency reports were completed,
on May 23, June 27, and August 8, 2013.  (AR 467.)  During
Plaintiff's August 8 visit, Dr. Hudler noted, she gave Plaintiff

                              25

a mental-status examination "[d]ue to her memory complaints, and
the mental status paperwork requested by her [attorney]." (AR
522.) Dr. Hudler noted that Plaintiff "scored an extremely low
12/30," which was "inconsistent with someone who basically lives
independently." (Id.) Dr. Hudler opined that "[t]herefore she
was very likely not giving her full effort." (Id.)

Dr. Hudler completed a medical-source statement for
Plaintiff's disability claim during the same visit. (AR 467-72.)
Under "clinical findings" she noted that Plaintiff "tends to be
impulsive [and] impatient" and "can be intrusive, [with]
inappropriate behavior at times." (AR 467.) Dr. Hudler gave her
a prognosis of "poor." (Id.) She ticked boxes indicating that
Plaintiff had symptoms of "[i]mpairment in impulse control,"
"[g]eneralized persistent anxiety," "[s]ubstance dependence,"
"[e]motional lability," "[e]asy distractibility," and "[m]emory
impairment – short, intermediate or long term." (AR 468.) She
did not tick the box for "[d]ifficulty thinking or
concentrating." (Id.) In the section asking Dr. Hudler to
provide an opinion "based on [her] examination" of Plaintiff, she
noted that Plaintiff was seriously limited or unable to meet
competitive standards[14] in almost all categories of work-related
skills. (AR 469.) Dr. Hudler noted that she "tends to go off
topic in conversation" and "becomes easily anxious to the point
of feeling overwhelmed [and] incapacitated." (Id.) She also

---

[14] "Seriously limited" means noticeable difficulty from 11
to 20 percent of the workday or workweek. (AR 469.) "Unable to
meet competitive standards" means noticeable difficulty from 21
to 40 percent of the workday or workweek. (Id.)

noted that Plaintiff was unable to meet competitive standards in setting realistic goals or making independent plans, and she had no useful ability to understand, remember, and carry out detailed instructions or deal with the stress of semiskilled and skilled work.  (AR 470.)  Dr. Hudler identified three episodes of decompensation, each allegedly lasting longer than two weeks: from April to May 2012, "winter 2012," and from January to February 2012.[15]  (AR 471.)  Under the question, "Please describe any additional reasons not covered above why your patient would have difficulty working at a regular job on a sustained basis," Dr. Hudler wrote: "Patient [did] not appear motivated to perform/function at her best[;] . . . for example, she had an abnormally . . . low score on a Mental State Exam on 8/8 due to lack of effort."  (AR 472.)

On October 7, 2013, Plaintiff met with Dr. Hudler again, and Dr. Hudler noted that gabapentin was helping her anxiety but that she did not regularly take all prescribed doses.  (AR 520.)  Dr. Hudler noted that Plaintiff was "calmer and less dramatic than at previous visits."  (Id.)

### d. *Consulting-physician examinations*

Plaintiff was scheduled to be examined by a consulting internist on June 28 and a consulting psychiatrist on July 5, 2012.  (AR 68.)  On June 15, 2012, she indicated that she would not attend the examinations "because she [was] in the [alcohol

---

[15] The third period of decompensation noted by Dr. Hudler, from January to February 2012, is before Plaintiff's alleged onset date of March 1, 2012.  "Winter 2012" is ambiguous and may be as well.

rehabilitation] [p]rogram" and was receiving treatment elsewhere. (Id.)  She did not explain how her participation in the program prevented her from attending the examinations, particularly given that she was apparently going to other off-site doctors.  (Id.; see, e.g., AR 355 (June 29, 2012 health-center visit).)  The consulting examinations were canceled.  (AR 68.)

### 3.  Analysis

The ALJ accorded "significant weight, but not full weight" to the opinions of the state-agency medical consultants and "limited weight" to the opinion of Dr. Hudler.[16]  (AR 23.)  He noted that the opinions of the state-agency consultants were "generally consistent in that they all assess the claimant is able to perform a range of work at the medium exertional level with some differences in the degree of specific function-by-function limitations."  (Id.)  The ALJ found that the opinions were all "reasonable and supported by the record as a whole." (Id.)  Rather than relying on one assessment in its entirety, he

---

[16] There were no opinions from examining state-agency consultants because Plaintiff canceled those exams.  (AR 68.)  If a claimant "do[es] not have a good reason for failing or refusing to take part in a consultative examination or test," the claimant may be found not disabled.  20 C.F.R. §§ 404.1518(a), 416.918(a). If the claimant had "a good reason" for failing to attend, the agency "will schedule another examination."  §§ 404.1518(a), 416.918(a).  Plaintiff did not attend her consultative examinations because she was in an alcohol rehabilitation facility, but she never explained how that prevented her from attending.  (AR 68.)  The ALJ did not mention the canceled examinations in his decision or base his finding of nondisability on Plaintiff's failure to attend; nor does Plaintiff argue that the medical record was undeveloped or that the ALJ should have sought further medical evidence.  Accordingly, the Court does not consider the issue.

"adopted those specific restrictions on a function-by-function basis that [were] best supported by the objective evidence as a whole." (Id.)

As an initial matter, Plaintiff incorrectly suggests that the ALJ was required to provide "clear and convincing" reasons for discounting Dr. Hudler's opinion. (See J. Stip. at 8.) Because Dr. Hudler's opinion was contradicted by the opinions of the state-agency medical consultants and those doctors based their opinions on clinical findings separate from Dr. Hudler's (see, e.g., AR 71-72 (Dr. Gilpeer citing health-center examinations conducted by Dr. Jonathan Baker (see AR 294-95, 302-03)), 91 (Dr. DeSouza relying on same and additional examination by Dr. Baker (see AR 306-07)), 94 (Dr. Balson relying on Dec. 2012 health-center assessment by Dr. Bruce Burris (see AR 441))), the ALJ needed to state only specific and legitimate reasons for giving Dr. Hudler's opinion limited weight. See Carmickle, 533 F.3d at 1164; Thomas, 278 F.3d at 957 ("The opinions of non-treating or non-examining physicians may also serve as substantial evidence when the opinions are consistent with independent clinical findings or other evidence in the record.") As discussed below, the ALJ met that standard.

The ALJ did not entirely reject Dr. Hudler's opinion; rather, he gave it "limited weight." (AR 23.) He incorporated into Plaintiff's RFC limits on "directing others, abstract thought, [and] planning," limited her to simple job instructions, and noted that her work environment should be "free of fast-paced production requirements" (AR 20), all of which were consistent with Dr. Hudler's opinion that Plaintiff would be unable to

understand, remember, or carry out detailed work instructions or deal with the stress of skilled or semiskilled work (AR 470). Thus, the ALJ did give Dr. Hudler's opinion some weight.  To the extent the ALJ rejected portions of Dr. Hudler's opinion, he did so for specific and legitimate reasons.

The ALJ permissibly gave limited weight to Dr. Hudler's opinion because it "depart[ed] substantially from the rest of the evidence of record." (AR 24.)  Indeed, Dr. Hudler opined that Plaintiff was seriously limited or unable to meet competitive standards in most areas of mental functioning (AR 469), but the state-agency consultants found at worst moderate limitations in only certain categories.[17]  (See, e.g., AR 72 (Plaintiff had no exertional or nonexertional limitations), 92 (Plaintiff "noted to improve with [medication] and sobriety" and "should be able to do at least [simple, repetitive] type work if she maintains sobriety and remains compliant with [treatment]"), 94 (noting no significant limitations in most areas of functioning).)  For example, Dr. Balson found Plaintiff "moderately limited" in her ability to "complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods" and in her ability to understand, remember, and carry out detailed instructions.  (AR 94.)  She was "not

[17] Plaintiff has not argued that the ALJ's RFC did not adequately take into account those moderate limitations to the extent the ALJ accepted them.  See Stubbs-Danielson v. Astrue, 539 F.3d 1169, 1173-74 (9th Cir. 2008) (ALJ's RFC limitation to "simple, routine, repetitive" work adequately accounted for functional limitations of "slow pace" and "several moderate limitations in other mental areas").

significantly limited" in the other eight categories of
functioning. (AR 93-94.) The state-agency doctors' opinions
were based on independent clinical findings showing that
throughout the relevant period Plaintiff's mental issues were
adequately controlled with treatment and medication. For
example, Dr. Gilpeer cited health-center records from May 18,
2012 (AR 72), which corroborated the finding that Plaintiff's
symptoms were not severe (see, e.g., AR 294 ("Neurological:
normal, no weakness" and "General: normal, no acute distress")).
Dr. DeSouza relied on the same records and also looked at a more
recent health-center record from September 20, 2012 (AR 94),
which provided further evidence of nonseverity (AR 306). Dr.
Balson reviewed clinical findings from December 2012 (AR 91-94),
which showed improvement and stability on current medications (AR
441). Moreover, Dr. Hudler gave Plaintiff a prognosis of "poor"
on August 8, 2013 (AR 467), but she reported improvement in a
subsequent visit on October 7 (AR 520).

Moreover, as the ALJ noted (AR 24), several of Dr. Hudler's
findings, such as that Plaintiff was seriously limited or unable
to meet competitive standards in almost all categories of work-
related skills (AR 470), were not supported by her own or any
other doctor's findings. For example, mental-status examinations
and assessments conducted by other health-center doctors showed
that Plaintiff had normal or average mental functioning and that
her mental symptoms were well controlled by medications. (See,
e.g., AR 262 (on May 16, 2012, noting that Plaintiff had "fair"
judgment and insight and presented as normal or average in all
other assessed categories), 277 (noting on June 13, 2012, that

31

Plaintiff had "intact" memory and "fair" insight and judgment),
276 (noting on June 18, 2012, that Plaintiff was responding well
to current regimen and depression "well controlled"), 348 (noting
on Aug. 2, 2012, that Plaintiff was assessed as normal or average
in all mental-exam categories).)  Some of Dr. Hudler's own notes
before her August 8, 2013 assessment reflected the same.  (See,
e.g., AR 410 (Dr. Hudler noting on Jan. 23, 2013, that
Plaintiff's judgment and insight were "fair"), 443 (Dr. Hudler
noting on Feb. 28, 2013, that Plaintiff's insight was fair to
good and judgment was good).)  Even Dr. Hudler's notes from her
August 8, 2013 assessment were contradictory as to Plaintiff's
symptoms: Dr. Hudler did not check the box for "[d]ifficulty
thinking or concentrating" as one of Plaintiff's symptoms but
then noted that Plaintiff had serious limitations or an inability
to "meet competitive standards" in areas of thinking and
concentration needed for unskilled work.  (AR 468-69.)

Moreover, although Dr. Hudler opined that Plaintiff had had
three or more episodes of decompensation (AR 471), one and
possibly two of those periods occurred before the alleged onset
date.  Finally, Dr. Hudler's most recent assessment, from October
7, 2013, noted that Plaintiff was "calmer and less dramatic than
at previous appointments," had "fair" insight and judgment, was
"alert and oriented," and had "coherent" thought processes.  (AR
520-21.)  Dr. Hudler recommended that Plaintiff continue with her
medication and return to AA.  (AR 521.)  The most recent
assessments of Plaintiff's mental functioning in the record, from
December 2013 and January 2014, noted that she had "no new memory
loss or depression" and "interact[ed] normally with others" (AR

476) and that her insight and judgment were "fair" and her affect
was "calm [and] congruent" (AR 519).

Thus, the ALJ permissibly gave limited weight to Dr.
Hudler's opinion because it was unsupported by her own treatment
notes and departed substantially from the record as a whole.  See
§§ 404.1527(c)(3)-(4), 416.927(c)(3)-(4); Valentine v. Comm'r,
Soc. Sec. Admin., 574 F.3d 685, 692-93 (9th Cir. 2009)
(contradiction between treating physician's opinion and his
treatment notes constituted specific and legitimate reason for
rejecting treating physician's opinion); Batson, 359 F.3d at 1195
("[A]n ALJ may discredit treating physicians' opinions that are
. . . unsupported by the record as a whole . . . or by objective
medical findings[.]").

The ALJ also noted that Dr. Hudler "apparently relied quite
heavily on the subjective report of symptoms and limitations
provided by [Plaintiff]" and "seemed to uncritically accept as
true most, if not all, of what [she] reported."  (AR 23.)
Indeed, Dr. Hudler's treatment notes reveal that she based her
opinion in large part on Plaintiff's subjective complaints and
self-reported history.  (See, e.g., AR 467 (noting that Plaintiff
"reports ongoing anxiety despite treatment"), 522 (noting that
Plaintiff gave "vague answers" to questions and listing
Plaintiff's self-reported symptoms), 526 (noting Plaintiff's
reports that certain drugs were ineffective).)  The ALJ noted
that "there exist good reasons for questioning the reliability of
[Plaintiff's] subjective complaints" (AR 23) and found her
"alleged severity of symptoms" to be "less than fully credible"
(AR 24).  A treating doctor's reliance on a claimant's incredible

subjective complaints is a legally sufficient basis to give that
doctor's opinion limited weight.  See, e.g., Tonapetyan, 242 F.3d
at 1149 ("Because the present record supports the ALJ in
discounting [claimant's] credibility . . . he was free to
disregard [treating physician's] opinion, which was premised on
her subjective complaints."); Tommasetti, 533 F.3d at 1041 ("An
ALJ may reject a treating physician's opinion if it is based to a
large extent on a claimant's self-reports that have been properly
discounted as incredible." (citation omitted)); Fair, 885 F.2d at
605 (finding that ALJ properly disregarded physician's opinion
when premised on claimant's subjective complaints, which ALJ had
already discounted).

A plaintiff's lack of effort, however, may not be used to
discredit a treating doctor's opinion when that doctor expressly
considered the lack of effort in his or her findings.  See Ogin
v. Colvin, 608 F. App'x 519, 520 (9th Cir. 2015) (claimant's
"lackluster effort" not a legitimate reason to discount treating
doctor's conclusions when doctor "expressly took into account
[claimant's] lack of cooperation in formulating his
conclusions").  It is not clear whether the ALJ gave Dr. Hudler's
opinion limited weight based in any part on her acceptance of the
results of Plaintiff's August 8, 2013 mental-status exam despite
her lack of effort.  (See AR 23-24.)  Because the ALJ gave two
other specific and legitimate reasons for giving limited weight
to Dr. Hudler's opinion, however, any error would be harmless.
See Stout v. Comm'r, Soc. Sec. Admin., 454 F.3d 1050, 1055 (9th
Cir. 2006) (nonprejudicial or irrelevant mistakes harmless);
Donathan v. Astrue, 264 F. App'x 556, 559 (9th Cir. 2008) (when

1  ALJ provided proper, independent reasons to reject treating

2  physician's opinions, any error ALJ may have made as to other

3  reasons was harmless and inconsequential).[18]

4       Plaintiff argues that "the opinion of a non-examining

5  physician cannot by itself constitute substantial evidence that

6  justifies the rejection of the opinion of either an examining

7  physician or a treating physician." (J. Stip. at 10.)  That is

8  not true.  The state-agency consultants' opinions were "supported

9  by the record as a whole" (AR 23), which included independent

10 clinical findings by doctors other than Dr. Hudler that the

11 state-agency doctors reviewed (see, e.g., AR 71-72 (Dr. Gilpeer

12 citing health-center medical examinations), 91 (Dr. DeSouza

13 relying on same and additional examination), 94 (Dr. Balson

14 relying on Dec. 2012 health-center assessment)).  That was

15 sufficient to constitute substantial evidence.  See Thomas, 278

16 F.3d at 957 ("The opinions of non-treating or non-examining

17 physicians may also serve as substantial evidence when the

18 opinions are consistent with independent clinical findings or

19 other evidence in the record.").

20

21

22       [18] The ALJ also noted "[t]he possibility . . . that a doctor

23 may express an opinion in an effort to assist a patient with whom
   he or she sympathizes for one reason or another" and "that

24 patients can be quite insistent and demanding in seeking
   supportive notes or reports from their physicians, who might

25 provide such a note in order to satisfy their patient's requests
   and avoid unnecessary doctor/patient tension."  (AR 23-24.)

26 Because the ALJ provided other legally sufficient reasons for

27 rejecting Dr. Hudler's opinion, the Court need not decide whether
   this was error.  See Stout, 454 F.3d at 1055; Donathan, 264 F.

28 App'x at 559.

**VI.   CONCLUSION**

  Consistent with the foregoing and under sentence four of 42 U.S.C. § 405(g),[19] IT IS ORDERED that judgment be entered AFFIRMING the decision of the Commissioner, DENYING Plaintiff's request for remand, and DISMISSING this action with prejudice.


DATED: September 28, 2016   _____
              JEAN ROSENBLUTH
              U.S. Magistrate Judge

---

  [19] That sentence provides: "The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."